PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

STEVEN S. WITT,

        *Plaintiff-Appellee,*

v.

WEST VIRGINIA STATE POLICE,
TROOP 2, Martinsburg, Berkeley
County; J.J. BOWMAN, individually
and in his Official Capacity; J.D.
BURKHART, individually and in his
Official Capacity; J.B. FLANIGAN,
individually and in his Official
Capacity,

        *Defendants-Appellants.*

No. 10-1008

Appeal from the United States District Court
for the Northern District of West Virginia, at Martinsburg.
John Preston Bailey, Chief District Judge.
(3:08-cv-00183-JPB)

Argued: December 7, 2010

Decided: February 4, 2011

Before MOTZ, AGEE, and KEENAN, Circuit Judges.

Dismissed by published opinion. Judge Motz wrote the opinion, in which Judge Agee and Judge Keenan joined.

**COUNSEL**

**ARGUED:** Jason Patrick Foster, STEPTOE & JOHNSON, LLP, Martinsburg, West Virginia, for Appellants. Harry P. Waddell, LAW OFFICE OF HARRY P. WADDELL, Martinsburg, West Virginia, for Appellee. **ON BRIEF:** Lucien G. Lewin, STEPTOE & JOHNSON, LLP, Martinsburg, West Virginia, for Appellants. David M. Hammer, HAMMER, FERRETTI & SCHIAVONI, Martinsburg, West Virginia, for Appellee.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

Steven Witt brought this § 1983 Fourth Amendment excessive force case against the West Virginia State Police and three troopers. After dismissing Witt's claims against the State Police and the troopers in their official capacity, the district court refused to grant summary judgment to the troopers in their individual capacity. Contending that qualified immunity protects them from suit, the troopers timely noted this interlocutory appeal. For the reasons that follow, we dismiss the appeal.

I.

The parties agree as to only some of the facts giving rise to this suit. They agree that on January 8, 2007, Witt consumed alcohol at a local bar and then joined his girlfriend, Candy Gedon, and her children for dinner at a restaurant. After dinner, Gedon drove Witt, who sat in the front passenger seat, and her children, who sat in the back, to her home. As Gedon pulled into her driveway, Trooper J.J. Bowman pulled his police cruiser behind her. The trooper activated his emergency lights and dashboard camera, but not the camera's

microphone. Shortly thereafter, Troopers J.D. Burkhart and J.B. Flanigan arrived at the scene. The troopers were acting on the belief that Witt was Daniel Anderson, who was similar in height and weight to Witt, was rumored to associate with Gedon, and was wanted for various crimes, including attempted assault of a state trooper two days before the evening in question. Within moments of Burkhart's and Flanigan's arrival at the scene, a scuffle ensued in which Witt suffered injuries including a left orbital fracture, a facial laceration of 2.5 centimeters, a scalp laceration of 2.5 centimeters, a second scalp laceration of 3 centimeters, and a closed head injury. Some of the scuffle was recorded by Trooper Bowman's dashboard video camera, but seven seconds occurred off camera.

The parties disagree as to virtually all other material facts. Witt maintains that after Trooper Bowman ordered Gedon, who had exited the driver's side door, to return to the car, the trooper walked to the passenger side, opened the door, and asked Witt to identify himself. Witt replied, "I'm Steve Witt. Who are you?" Trooper Bowman told Witt he was a state trooper and asked Witt for identification. Witt responded that his identification was in his wallet and began to reach for his back pocket where he kept the wallet. At that point, the trooper pushed Witt and yelled, "Where's your wallet at?" Witt replied, "If you back off of me, I'll get my wallet." Trooper Bowman then "grabbed" Witt and "yanked [him] out of the car," while ordering him to "get the fuck out of the car." Once on his feet, Witt pulled his arm from the trooper's assertedly painful grasp.

At this time, Witt noticed Troopers Flanigan and Burkhart approaching and that Trooper Burkhart was pointing a gun at him. According to Witt, as the troopers surrounded him, Trooper Bowman began to pull Witt down toward the ground. As Witt fell, Trooper Burkhart struck him in the head with his gun. Witt claims that he was not resisting the officers or moving toward them in a threatening manner. Moreover, accord-

ing to Witt, although he called out that his head was split open, the troopers continued kicking and kneeing him as he lay face down in a mud puddle. Witt maintains that he initiated no blows but "may have swung" after being "hit several times." The troopers then took Witt's wallet, handcuffed him, dragged him across the yard, and threw him against a tree. Both Gedon and one of her children corroborate Witt's version of events.

The troopers relate a very different tale and maintain that the video from Trooper Bowman's dashboard camera substantiates their version of events. The troopers contend that the video demonstrates that (1) Witt, not Trooper Bowman, forcefully opened the passenger side door of Gedon's vehicle and then swung both of his legs out of the vehicle; (2) Witt stood up in front of Trooper Bowman in an aggressive manner; (3) Witt never reached for his wallet before or after he stood up; and (4) Trooper Burkhart reholstered his service weapon without ever striking Witt. The troopers maintain that, after the parties moved out of camera view, as Trooper Bowman brought Witt to the ground, Trooper Flanigan inadvertently struck Witt on the back of the head with a Maglite flashlight, and that this inadvertent blow, not any intentional beating, caused Witt's injuries.* The troopers concede that as Trooper Bowman began to bring Witt to the ground, the entire incident moved off camera.

The district court denied the troopers' motion for summary judgment on qualified immunity grounds, concluding that Witt presented sufficient evidence to raise genuine issues of material fact. The troopers timely filed this interlocutory appeal. Witt has moved to dismiss the appeal, arguing that we lack jurisdiction to entertain it.

---

*The troopers spend a good deal of time describing Witt's criminal history and possession of illegal narcotics. Of course, these facts are irrelevant to the excessive force analysis because, as the troopers themselves acknowledge, they "did not know" these facts "at the time" they allegedly beat Witt. Appellants' Br. at 18.

## II.

"[Q]ualified immunity protects government officials from liability for violations of constitutional rights that were not clearly established at the time of the challenged conduct." *Iko v. Shreve*, 535 F.3d 225, 233 (4th Cir. 2008) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It constitutes an "immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted). Accordingly, "a district court's denial of a claim of qualified immunity, *to the extent that it turns on an issue of law*, is an appealable 'final decision' . . . notwithstanding the absence of a final judgment." *Id.* at 530 (emphasis added); *see also Behrens v. Pelletier*, 516 U.S. 299, 301 (1996); *Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Winfield v. Bass*, 106 F.3d 525, 528 (4th Cir. 1997) (*en banc*).

However, "a defendant, entitled to invoke a qualified immunity defense, may *not* appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson*, 515 U.S. at 319-20 (emphasis added). Although an appellate court can, on interlocutory appeal, decide "purely legal questions relating to qualified immunity," it may not reweigh the record evidence "to determine whether material factual disputes preclude summary disposition." *Iko*, 535 F.3d at 234; *see also Culosi v. Bullock*, 596 F.3d 195, 203 n.6 (4th Cir. 2010); *Winfield*, 106 F.3d at 529.

Further, we must "examine the parties' appellate arguments to ensure that we only consider those legal questions formally raised on appeal." *Iko*, 535 F.3d at 235. "This step is particularly important in interlocutory appeals regarding qualified immunity, because a party can so focus its appellate argument on factual disputes that it fails to raise a single legal question appropriate for appellate review." *Id.* at 235 n.8; *see also*

*Johnson*, 515 U.S. at 314 (dismissing appeal because the Court could not "find any 'separate' [legal] question—one that is significantly different from the fact-related legal issues that likely underlie the plaintiff's claim on the merits").

With these governing principles in mind, we turn to the case at hand.

### III.

After carefully reviewing the parties' differing accounts as to the underlying facts, the district court denied the troopers qualified immunity because it concluded that Witt had produced evidence raising questions "of material fact with regard to his § 1983 excessive force claim." *Witt v. Bowman*, No. 3:08-cv-183, at 10 (N.D.W. Va. Nov. 12, 2009). "[W]hether Witt posed a threat to the safety of the troopers and whether he resisted or attempted to evade arrest" were, the court found, "crucial facts to be analyzed in determining whether the troopers violated the Fourth Amendment and, if so, whether they should have known their conduct was impermissible." *Id.*; *see Graham v. Connor*, 490 U.S. 386, 396 (1989). The court further found that "the credibility of testimony" and "the reliability of documentary evidence" in this case presented genuine disputes as to these "crucial facts." *Witt*, No. 3:08-cv-183, at 10-11. The district court concluded that the lack of neutral witnesses pitted the self-interested testimony of the troopers, who had one account of events, against the self-interested testimony of Witt, Gedon, and her daughter, who had a very different account, and that the poor quality of the video did not resolve these disputes. This finding, that genuine disputes of material fact preclude the grant of summary judgment on qualified immunity grounds, would seem to require us to dismiss the troopers' interlocutory appeal for lack of jurisdiction. *See e.g.*, *Johnson*, 515 U.S. at 319-20.

The troopers maintain, however, that they raise the legal question "inherent in every determination that a governmental

official is not entitled to qualified immunity." *Winfield*, 106 F.3d at 529; *see also Behrens*, 516 U.S. at 313. That is, that the facts "viewed in the light most favorable to the nonmoving party," *i.e.*, Witt, demonstrate that the troopers' conduct violated no "clearly established" right. *Winfield*, 106 F.3d at 529. The record offers no support for this contention. Rather, instead of viewing the facts in the light most favorable to Witt, time and again the troopers attempt to resolve disputes as to material facts in their own favor.

Moreover, contrary to the troopers' contentions, the video from Trooper Bowman's dashboard camera does not compel adoption of the troopers' version of the facts and rejection of Witt's. If it did, this would be a very different case. For when a video "quite clearly contradicts the version of the story told by [the plaintiff] . . . so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007); *accord Iko*, 535 F.3d at 230.

Of course, *Scott* does not abrogate the proper summary judgment analysis, which in qualified immunity cases "usually means adopting . . . the plaintiff's version of the facts." 550 U.S. at 378. Thus, *Scott* does not hold that courts should reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers *some* support for a governmental officer's version of events. Rather, *Scott* merely holds that when documentary evidence "blatantly contradict[s]" a plaintiff's account "so that no reasonable jury could believe it," a court should not credit the plaintiff's version on summary judgment. *Id.* at 380. As such, *Scott* simply reinforces the unremarkable principle that "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party" when "there is a '*genuine*' dispute as to those facts." *Id.* (quoting Fed. R. Civ. P. 56(c)) (emphasis added).

Turning to the video in this case, it does not "clearly" or "blatantly" contradict Witt's "version of the story." *Id.* at 378, 380. Rather, it provides little assistance in resolving the parties' disputes as to the facts. First, because Trooper Bowman failed to activate the camera's microphone, the video lacks sound. The viewer cannot hear whether Witt properly answered Trooper Bowman's questions and followed the trooper's orders (as Witt claims) or resisted arrest posing a threat to the troopers' safety (as the troopers claim). *See Blaylock v. City of Philadelphia*, 504 F.3d 405, 414 (3d Cir. 2007) (emphasizing that in *Scott* the "videotape of undisputed authenticity depict[ed] all of the defendant's conduct and all of the necessary context that would allow the Court to assess the reasonableness of that conduct").

Not only are we left with a soundless video containing mere images, but also, as the district court noted, these images themselves are ambiguous due to the unreliable quality of the video. It is difficult to decipher from reviewing the video the true sequence of events. *Cf. Iko*, 535 F.3d at 231 (noting that the video in that case undisputedly depicted the "general sequence of the events"). For example, although the troopers contend that the video "confirm[s]" that *Witt* forcefully opened the passenger side door, Appellants' Br. at 12, the police sergeant who investigated the incident concluded that the video corroborated Witt's claim that in fact *Trooper Bowman* "opened the passenger's door."

Furthermore, the video fails to capture seven important seconds of the incident, about which the parties' accounts decidedly differ. It is during these seven seconds that Witt sustained his head and eye injuries, which he contends the troopers caused by striking him with a firearm and repeatedly kicking and kneeing him as he lay face down on the ground. According to the troopers, during these same seven seconds they fell to the ground with Witt and inadvertently struck him on the head with a flashlight. The parties' dispute as to what actually happened during these seven seconds is critical to the

summary judgment analysis, because that dispute goes directly to the reasonableness of the troopers' use of force.

In sum, the documentary evidence in this case—the dashboard video—does not "blatantly contradict[ ]" Witt's account of the facts; therefore, it "does not establish that the officers are entitled to summary judgment." *See York v. City of Las Cruces*, 523 F.3d 1205, 1210-11 (10th Cir. 2008) (refusing to direct grant of summary judgment when an audio tape recorded "only part of the incident involving the [plaintiff] and the police officers"); *Blaylock*, 504 F.3d at 414 (holding documentary evidence did not establish that plaintiff's version of events was "blatantly and demonstrably false"); *see also United States v. Hughes*, 606 F.3d 311, 319-20 (6th Cir. 2010) (finding *Scott* inapplicable, in determining probable cause for search, when documentary evidence made party's account of disputed fact merely "'unlikely,'" rather than "utterly discredited" (internal quotation omitted)). Moreover, the troopers' attempt to "rehash[ ] the factual dispute below" provides no basis for interlocutory appeal of the district court's order denying summary judgment on qualified immunity grounds. *Iko*, 535 F.3d at 235.

## IV.

Since the troopers seek to appeal from an order that simply determines that "the pretrial record sets forth a 'genuine' issue of fact for trial," *Johnson*, 515 U.S. at 320, we must dismiss the appeal for lack of jurisdiction.

*DISMISSED*